The final case number 26-1099, Pharmaceutical Research & Manufacturers of America v. Erin M. Frey et al. At this time, would counsel for the appellant please come to the podium and introduce herself on the record to begin. Good afternoon, Your Honors. Erin Murphy on behalf of PhRMA. If I may, I'd like to reserve three minutes of rebuttal. Thank you. I know there's been a lot of water under the bridge at this point, but I do want to start in a little bit of the same place, but perhaps head in a little bit of a different direction. What we see as the most fundamental problem with this statute and with statutes like it, is that this statute expressly and exclusively regulates the terms of participation in a federal program. Maine doesn't and can't deny that. If the 340B program went away tomorrow, this statute would cease to do anything. It exists solely to deal with what happens when companies are participating in this program. Our contention is that that's something that states just don't have any inherent or presumptive power to do. They can't do that. They can't regulate a federal program unless Congress clearly and unambiguously authorizes them to do so. That's the principle that emanates from a long line of intergovernmental immunity and preemption cases dating all the way back to McCulloch v. Maryland, where the Supreme Court said that states just don't have the power to in any manner control the operations of the constitutional laws enacted by Congress. The program isn't about the volume sold and it's only about the price. If you just accept that premise, then is this regulating the program? Absolutely, because the only conduct that is being regulated is our members' participation in the 340B program. The only way this law does anything is if we are in the act of engaging in our offers, engaging in our sales, under the auspices of the 340B program itself. So just because, whether you think that it's a term that conflicts with or just isn't in the program, it is a term that's being added to the program. One of the best illustrations of this is Maine's response to our Abri Friend's Takings argument, where they say, look, if you don't want to do this, just drop out of the 340B program. That's a concession that the way this works is there is no obligation under state law unless you are participating in this federal program. And so I think once you kind of look at it through that lens, it really doesn't matter if the terms conflict with, if they're contrary to what Congress wanted, if they're just something Congress didn't think about. It's a discrimination point. I think you can think of it as discrimination, direct targeting. It's the same principle that the now vacated, but the decision from the Fourth Circuit majority was relying on. And I actually think one of the cases that best articulates this is Buckman, which is a preemption case, not styled in intergovernmental immunity terms, but what the court said there. First, even though the court was dealing with a generally applicable tort law, it said the relevant field was what was being regulated in that case. The relevant field was that the state was trying to regulate fraud on the FDA. And it said that's not something that states have any traditional power to do. States don't get to come in and kind of deal with what they think was fair or unfair to the federal government. And that really was not, that was just like the beginning and the end of the court's preemption analysis in Buckman. They basically said once we've determined that what the state is trying to do is regulate directly, exclusively directly regulate a program that originates from, is governed exclusively by, and terminates according to federal law, that's just something the states don't get to do. And I think this case is actually a fortiori of Buckman because we don't have a generally applicable law here. We have a law that by design, and I think by admission by the state of Maine, is the whole point of it is to alter the terms of participation in the 340B program. To say if you choose to be part of this federal program, you now have to comply not only with whatever conditions Congress set on it, but also with the conditions that Maine has chosen to set on it. And that's a problem we think from, you know, you can think about that through intergovernmental immunity. It is discrimination, it is targeting in what case is like the Washington. Just so we cover that, so that the trigger or the entryway to that doctrine seems to be this deal with words that then, at least in Washington, they sometimes say EG contractors and other times describe it as contractors. Is this a contractor or is this a participant in some other way? So I don't think the doctrine is specific to contractors. That's a context in which it has come about a lot. But, I mean, again, the doctrine is often traced to McCulloch, which is a case that has nothing to do with federal contractors. It's federal instrumentality. It's been applied in cases like Phillips Chemical that involve lessors of federal property. And I think even though Buckman is framed as a preemption case, it really sounds in intergovernmental immunity principles. And that's a case, that's not even a spending power program. It's just a federal regulatory program. It's just people who are applying for the approval for a new medical device. And the court says if you're regulating within the context of an inherently federal relationship, that's what the states can't do. And so I don't think it makes sense to try and cut that doctrine off and say, no, no, no, it only applies if it's like a procurement contractor. It's not a doctrine that's about protecting contractors. It's a doctrine that's about protecting the federal government and the means through which the federal government, whatever it creates, whether it creates an instrumentality, a contract partner, a regulatory partner, a spending power program partner. If the government is creating something to effectuate its ends and it is determined, you know, it's created all the terms of the program, states don't get to come in and layer on their own regulation unless Congress clearly and unambiguously authorizes them to do so. It hasn't created all the terms of the program? It has. I mean, by definition, when it comes to a spending power program, the Congress has created all the terms of the program. It has to. That is that point, which may be right. That's the key thing. I mean, I don't think we quite see eye to eye in the way, you know, from the questions you've been asking about that today. I don't think that if you thought Congress didn't speak to delivery in the 340B program, that that would mean that a regulation of delivery within the 340B program is somehow outside the scope of the 340B program. So I don't think even if you accepted the premise, which we don't, and I'd be happy to talk about that there was true silence here and Congress is completely agnostic as to, you know, any delivery conditions, even if you accepted that premise when the state is saying we're not regulating delivery generally, like if you're some manufacturer who doesn't participate in 340B, we don't care how you deliver your drugs. We only care about it here. I don't think the states can do that even if Congress hasn't spoken to delivery. They are dealing with the federal government, and that law, as you just described, is discriminating against them because they are a 340B participant. It is singling out, targeting, discriminating, however you want to think about it. And I think you get to the same kind of basic – get to the same result if you think about this through field preemption. The way I would conceptualize it there is much the way that I take the Fourth Circuit panel to have, which is to say that under the same principles, when it comes to a federal spending power program, Congress has defined the field. The field is set by Congress. It has to be. As a constitutional matter, Congress has to establish the terms on which federal money is going to be spent. A spending clause program and say, okay, those are the conditions. That's not everything that's relevant to this program. The conditions don't cover everything. And so I join that program understanding that there's going to be uncertain terms where we're going to have to fight it out in the greater world, so to speak. I don't think you do. I think the principle that you join that program against is the principle that's governed in this country for two centuries, which is states don't get to come in and add terms. You may be subject to some federal regulation. You're certainly subject to generally applicable law. I mean, I want to be clear about that. Set that to one side, I do think parties come in understanding that they don't get out of complying with state law just because they're a federal partner. But the background rule, the constitutional structural rule, is you aren't subjecting yourself to state regulation of the federal program qua federal program. And so I think particularly when you put that in the context of a spending power program, where, as some of my colleagues have discussed, you also have a clear statement rule that comes into play. I mean, even independent of the intergovernmental immunity principles here, that clear statement rule ought to compel the conclusion that Congress has to invite states into a federal spending power program if it wants participants to be subject to discriminatory state laws, not generally applicable ones, but to let the state set the terms. And, of course, there are programs where Congress does it that way. The Supreme Court dealt in the Walsh case and in the Dublino case with cooperative federalism spending power programs where the state is the recipient of the fund and federal law is basically piggybacking off of state law and Congress is inviting states and, in fact, asking states, you know, we want you to administer this program. We want you to help set the terms. That's a very different context because there what you have to do is basically analyze the federal statute to understand the scope of the role that Congress gave the states. But there's no argument that the 340B program is that kind of program. It's not just that states don't participate. They have no role. You know, no state in any of these cases we've tried to litigate anywhere has ever tried to argue that they could actually satisfy a kind of clear statement, clear and unambiguous, invite the states into the rule if that's the rule that governs in this context. So we certainly agree with all the arguments that have been made today about conflict preemption, preemption under a more traditional analysis. We think there are really fundamental problems with the claims data limitations, with the price is really what volume and price are just kind of two different ways of saying the same thing. At the end of the day, you have the ADR problem. Volume and price are the same thing. To me, price times volume equals cost. Volume and price are two different ways of saying the same thing because it's just what price are you selling the rest of the volume at? I mean, that's really what this is about. We're going to sell the same volume no matter what. All of our members are happy to sell to covered entities whatever volume and to contract pharmacies any volume of drugs. The only question is what percentage of that volume is going to be at the 340B price. So really, volume here is a question of the volume at a particular price, not volume qua volume. Congress writes this program and this goes back to my first question now a long time ago. If Congress writes the program and says we don't care about the volume. We just care that they hit this ceiling price because that has another effect on the Medicaid rebate program. This is going to make it all work. That's all we care about. Then what? That doesn't allow states to come in and change the terms because states don't have the inherent power unless Congress invites them to do so, to come in and directly regulate the terms of a program. Now, I mean, I just want to be clear. We don't think that Congress actually did that. I think what the D.C. Circuit and the Third Circuit were saying is actually no, no, Congress does care, and that's why those courts said there could be conditions that violate federal law. It's not that there's no interest at all in limitations on volumes or limitations on delivery. It's just that these particular conditions are permissible under federal law. So I think it's a bit of a misnomer to read into the fact that they use the term silence, the idea that the federal statute is completely agnostic as to any of this. Obviously HRSA has had rules and regulations for over 15 years about the use of contract pharmacies. Thank you very much. Thank you. Thank you, Counsel. At this time, would Counsel for the United States please introduce himself on the record to begin? He has a five-minute argument. May it please the Court, Yakov Roth on behalf of the United States, and thank you for allowing us a few minutes to share the federal perspective on these issues. I think at its heart, the controlling proposition here is actually quite simple. States cannot impose special obligations on participants in federal programs by virtue of their participation in federal programs. Just in the same way that states cannot single out federal employees for special obligations, they cannot single out federal contractors for special regulation, they cannot single out participants in federal programs for special obligations. And that is what is going on here. I think Counsel for the State conceded it. They are latching onto the federal program as the hook for their regulations. The state regime is completely parasitic on the federal program to the point that they are effectively regulating the 340B program. I think nobody would... Under your argument, if they're regulating the 340B program, or is it enough that the law as defined by them applies to only 340B covered entities? I mean those to be the same thing. If you are singling out participants in the 340B program and altering what they must do, you are effectively changing the terms of the 340B program. So I'm just using that as a shorthand for this sort of discriminatory type of state regulation. And to give an example, I don't think anyone would dispute that if the state said, manufacturers who participate in Medicare and Medicaid, they must have lots of money to spare, $10 million tax in our state for manufacturers who participate in Medicare. I don't think anyone would really seriously argue that that is allowed under the Supremacy Clause. And I think the principle is exactly the same here. And here's another hypothetical that goes to judge A-frame, your question about volume. Let's say the state said, under 340B, you have to sell at the discounted price to covered entities. In Maine, if you participate in that program, you have to offer that price to everybody. That would increase volume, right? But it would be singling out the participants in the federal program for that special obligation. That is what states cannot do. That is outside their lane. And to be clear, as Council for Pharma, I think, acknowledged as well. The doctrine that does that is what? Inter-community? I think that is really where it comes from. I agree that the label is less important than the substance of the principle. And you can think of it as field preemption also if you define the field as the terms of the 340B program and participation in the program. I think there are different ways to get at it. But I think, however, whatever label you want to give it, that's the important takeaway that has to be true. Does the government think deals with as used in Washington applies to all participants in spending clause programs that sign things like these PPAs? Yes, we do. And I think it applies beyond that as well. I mean, think about federal benefit recipients. Think about Social Security, right? A state could not come and say, we're putting a surtax only on federal Social Security income. That would be discriminating against the recipients of a federal benefit. They can't do that. They can have general taxes, of course. States can tax. States can do economic regulation. We're not challenging the state's power to do neutral, generally applicable regulations. But they didn't do that here. The reason they didn't do that here, I think, as counsel conceded, is that would walk them into a takings clause problem. And so they tried to hook it onto the voluntary federal program to avoid that. That, of course, walks them into the supremacy clause problem. Now, the last thing I want to say, and this hasn't come up yet, so I want to make sure I get it in, is why do we care? Why does the federal government care about this? Why am I here? It's not just the principle. If states can alter, effectively alter, the terms and conditions and add new obligations to participants in these federal programs, that alters the incentive structure for manufacturers deciding whether to participate in the program or not. And if all states can go ahead and layer their own additional obligations on top of what federal law requires, then some manufacturers are likely to withdraw from the programs. And it's not hypothetical anymore. As we say in the brief, one manufacturer already has pulled out of Medicare and Medicaid as a result. If a few more manufacturers do that, these programs will be in big trouble, because tens of millions of beneficiaries will not be able to get their medicines that they are supposed to get under Medicare and Medicaid. And even if manufacturers don't pull out entirely, it's important to keep in mind that Congress uses Medicare and Medicaid participation as a carrot to induce manufacturers to participate in programs like 340B, like the Inflation Reduction Act pricing program and other programs. If states come along and nibble at that carrot by adding terms, the next time Congress wants to do this, manufacturers will not be interested, because there will not be enough carrot left. And so if I leave the Court with nothing else, I think the proposition here is states cannot eat the federal carrot. For that reason, this law should be enjoined. Thank you. Thank you, Counsel. At this time, would Counsel for the Appellees please introduce herself on the record? She has a 20-minute argument. Thank you. Good afternoon. Kimberly Patwarden on behalf of the State of Maine Defendants. In the state's view, this case should be decided on traditional preemption principles, and intergovernmental immunity does not preclude the operation of Chapter 103 for two broad reasons. First is because the doctrine does not apply here to protect Farmers members, and second, even if it does, Chapter 103 does not violate the intergovernmental immunity doctrine. In that traditional preemption analysis, we think the Court should affirm the decision of the District Court, and although the District Court did not address the public interest element of the preliminary injunction standard, we think Chapter 3 should not be enjoined while this litigation is pending. It's in the public interest for covered entities to continue providing critical health services to their patients and rural communities. With respect to why intergovernmental immunity does not apply here, in our brief, we tried to untangle the different branches of intergovernmental immunity. So that would be, I think, direct regulation, the anti-discrimination principles, and then anti-commandeering. But one key consideration is the identity of the actor or allegedly regulated party, the federal government itself, one of its employees, or instrumentalities, or a contractor. The direct regulation portion of intergovernmental immunity applies to the federal government and its instrumentalities. I don't understand the direct regulation aspect of intergovernmental immunity to apply to contractors. So in order for pharma's members to claim the protection of intergovernmental immunity under a direct regulation theory, they have to stand in the shoes of the federal government. We don't think that that's really the case here. How about discrimination? That seems like the best. Your law, do you agree, clearly discriminates in the sense that it applies only to entities that are within the scope of this federal program? So the aspect of anti-discrimination applies to those with whom the federal government deals. But in our view, and pharma here really is relying on the PPA, the agreement, in order to invoke the anti-discrimination aspect of intergovernmental immunity. The state agrees with the district court that the PPAs are the mechanism by which manufacturers opt into the 340B program and really nothing more. What does that mean though? I guess that's, I mean, I've read those words, but what does that really mean? I mean, there's a choice that's out there. You can join our program and that will cost you and benefit you. It'll benefit you because you participate in Medicare and Medicaid. It will cost you because you'll have to pay low 340B prices. Hmm, should I do that? Yes. What does that mean I'm doing? Well, I'm signing up with the federal train, both good and bad, and I'm on the train now. So that does seem like you're dealing with the United States, and I don't think you can look at this law and say it doesn't discriminate. It clearly discriminates. I don't necessarily use that in a negative or positive way, but it makes a choice on how you're treated based on you being in a federal program. So if that's all true, why are you not dealing with, like, I mean, the Fourth Circuit in the case most favorable didn't want to go this route. I'm looking for someone to tell me why was that judge reluctant to do so? There's something about this that even led that judge who agreed with a lot of the other arguments to say I'm not going to do that. What do you think that is? I think it's that the the nature of the relationship or the contractual relationship in between the federal government and, for example, the the the cleanup crew or the Boeing. Right. There has to be a necessary contractual relationship or connection in between the federal government and this other entity in order for the anti-discrimination principle to apply to apply. Otherwise, nearly every federal program participant would try to claim the federal government's immunity and seek and relief and immunity from all kinds of state laws. Like, look, there's millions and billions of people in Social Security. If they come in and do something to that group of people, which is very, very large, and it's because of their participation in that federal program, that's what's not OK. General applicable laws are fine. But if you target them because of their status in the program, that's forbidden. And you say that's wrong. So I think that the federal government said I heard him. I heard the federal government say that intergovernmental immunity protects participants in federal programs. That's an expansion of intergovernmental immunity. The doctrine applies to contractors. So we disagree here. It applies to contractors, which implies there has to be a contractual relationship. The relationship has to be close enough in between the federal government. It actually says deals with, at least Washington says, deals with, e.g., contractors, which is not that helpful because it says deals with, for example, contractors. And then is that a closed universe? What is that? And building off that, does it matter here, should we be looking at who the entity is? Are they a contractor? Are they a Social Security recipient? Or is the question rather that there is a contract exists? And so the status of contractors suggests that you're doing something on behalf of the government. But should we set that aside and this e.g., contractor argument, and instead ask, is there a regulation of a government contract? And in this case, there is a PPA in place, and they're regulating that. So in some ways, then, who the entity is goes by the wayside. If you're focused on is there a contract in place, and then we don't reach the question of the Social Security recipients. We're looking at this as is the state changing the terms of a government contract? I suppose that's one way that you could look at it. I'm not sure that that particular theory of intergovernmental immunity is supported by the case law. Again, when we're talking— But what you're doing then, if you're looking at it, you're actually changing something that the government has done as the government. I don't think that's right. Why is that? Because there isn't anything about the federal relationship or anything about Chapter 103 that affects the relationship or the terms of that PPA. If PhRMA's members comply with all of the terms that are provided in the PPA, they will have access to the Medicaid and Medicare Part B program. All of that agreement is— There's one more condition, right? There's one more condition to the PPA that there was not before. Can you rephrase the question? But there's one more condition, because the manufacturer who could previously limit, who could obtain these lower prices, the discount prices, they can no longer make that determination themselves. So there's a new condition on the PPA. That's not a part of the PPA agreement at all. The PPA agreement doesn't speak to contract pharmacies or delivery to contract pharmacies or claims data. Nothing in the PPA is really affected. Except this now becomes effectively part of that PPA, because the state has adopted this new requirement on what was a previously defined relationship between the government and the manufacturer. No, I disagree. The state disagrees. Regardless of whether or not pharmacist members comply with Chapter 103, that will not change their access to the Medicaid and Medicare Part B programs. That operates all at the federal level. So there isn't any change in the nature of that contractual relationship, if we even want to call it a contract, a subject such that the intergovernmental immunity would apply here. But there's nothing about Chapter 103 that changes that. If pharma's members don't comply... No, but I'll get punished if I do everything in the contract but not this other thing. I'll be punished. Why will I be punished? Because I am part of the 340B program and won't do this other thing. But that's not a function of the contract itself. So that's a function of... But isn't it discriminated against me because I've entered into a contract with the federal government? So, again, we disagree that this is the level of relationship that is entitled to the protection of the anti-discrimination principles. There isn't any control by the federal government over drug manufacturers. They don't really manage what the manufacturers are doing on a day-to-day basis. They're not really... The federal government isn't really purchasing any sort of goods or services. Manufacturers are acting of their own accord. And while that might not conflict with the 340B statute, it doesn't entitle them to have the protection of the federal government to their activities with respect to Chapter 103 or with respect to even the 340B program generally. Again, there is a distinction in between the type of actor and sort of the protection that is afforded to that entity. Obviously, the federal government, its instrumentalities have the most protection. But contractors have less. They are not the federal government and they are not the instrumentalities. And I guess where we're trying to... The conversation we're having is whether or not the nature of the relationship, federal program participation, is such that it should entitle them to the protection for contractors. The state maintains that the agreements in between the HRSA and the manufacturers is not that type of contract. And so it doesn't trigger the anti-discrimination principles. I will also say that regardless, we don't view there to be discrimination. All manufacturers doing business in Maine and participating in the 340B program are subject to the same restrictions. And none of those manufacturers can interfere with contract pharmacy arrangements for delivery or 340B drugs to patients of Maine-covered entities. In the state's view, manufacturers that participate in the 340B program are not comparable or similarly situated to manufacturers that don't participate in the 340B program. There's also no evidence in the record to support that any manufacturer is really being treated differently. Thank you. Thank you. Thank you, counsel. At this time, would counsel for the appellant please reintroduce themselves on the record? They have a 20-minute rebuttal. Erin Murphy for PhRMA. Just a few points. First, I just want to note, you know, you suggested maybe there's some reason the Fourth Circuit didn't go down this path. I would note, we didn't specifically brief the question there of whether this doctrine applies in the scope of the doctrine. So I'd be a little cautious about reading too much into, you know, we have had a chance to brief that here. Yeah, I mean, he did say, like, it does not apply here, but some of its ideas do. And I'm just trying to get my mind around it. Yeah, you know, I mean, it's a one-sentence statement with no real explanation. And we've thoroughly briefed here why we, you know, I don't mean to take issue with it. We absolutely agree with, you know, about 90 percent, if not more, of what's in that opinion. But on that particular point, we do part ways. And I just don't think, I haven't heard the state articulate any reason why the discrimination principle would somehow be confined to federal procurement contractors. I mean, it's not a principle. I mean, if you view that argument as having some basis in, it should, it's protecting the federal government in some way. Like in Washington, it's going to cost them more. Is the argument here, it's not that you're going to lose important players in your Medicare and Medicaid program? Is that the idea? Exactly that. Exactly that. And that's why I think, you know, when I read Buckman, I keep looking for the court to actually say. Everything about it really sounds in the same principles. And what the court says there is the reason that states can't come in and single out a federal relationship, an inherently federal relationship, is because that inherently harms the federal government because it makes people less willing to enter into federal relationships. It means people are going to be second guessing whether they should come apply for the, you know, the new device there. Whether they should take part in Medicare or Medicaid here. And so it's in the nature of it that when you single out a contractor, a participant, a federal instrumentality, whatever it is, you're always going to be at odds in a sense with the federal government. And that's what I take to be the core of the discrimination principle. How far down the road do you travel? Do you share the view that this argument applies to the Social Security recipient? Or do you think that there needs to be some sort of contract in place? I don't think there needs to be a contract in place because I just don't think the principle is about contracting. I think it's about not singling out inherently federal things, whether those are contractual relationships, confederal instrumentalities, federal benefit recipients, whatever it is. That said, we do have a contract here. So I think you don't even kind of need to answer that question in this case because we have a PPA. And really all I heard the state say is, well, we're not like literally rewriting your PPA or directly controlling every aspect of it. I mean, I think they are, but I also don't think that matters. And Washington is the best illustration of that. That case wasn't at all about a state trying to control the manner in which the federal contractors provided services. It was just the state saying, if you're a federal contractor, we're going to give your employees different benefits that are greater than the benefits available to non-contractors. So the core prohibition is on discrimination, not efforts to directly control the kind of execution of the federal agreement. Thank you. Thank you. That concludes argument in this case.